**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **ROMMEL MONTEZ,** | § | |
| | § | |
| *Plaintiff,* | § | |
| **v.** | § | |
| | § | **EP-23-CV-00155-ATB** |
| **KILOLO KIJAKAZI,** *Acting* | § | |
| *Commissioner of Social Security* | § | |
| *Administration*, | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM OPINION AND ORDER

This is a civil action seeking judicial review of an administrative decision.  Pursuant to 42 U.S.C. § 405(g), Plaintiff Rommel Montez, the claimant at the administrative level, appeals from the final decision of Defendant Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration ("Commissioner"), denying his claim for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq.*  For the reasons set forth below, the Court finds that the Commissioner's decision should be affirmed.[1]

## I.   BACKGROUND

On February 24, 2022, Montez applied for disability insurance benefits, alleging disability beginning October 6, 2021.[2]  He alleged that he became disabled due to schizoaffective disorder, clinical depression, acute anxiety, right shoulder bicep tear, right knee damage, and

---

[1] After the Honorable District Judge Kathleen Cardone referred the case, pursuant to 28 U.S.C. § 636(b), to the undersigned Magistrate Judge, the parties consented to have the undersigned decide the case and enter final judgment.

[2] Tr. of Admin. R. [hereinafter, cited as "Tr."] at 211.

back pain.[3]  At the time of application, he was 37 years old.[4]  Previously, he obtained his GED and then attended college, but dropped out of college to join the United States Army.[5]  He worked as, *inter alia*, an assistant manager at an auto parts store and a mechanic for vehicles (such as Humvees) in the Army.[6]  In October 2021, he was medically discharged from the Army.[7]

Montez's application was denied initially on March 23, 2022, and on reconsideration on May 19, 2022.  Thereafter, Montez requested a hearing before an Administrative Law Judge ("ALJ"), and ALJ Ben Barnett held a hearing on October 17, 2022.  At the hearing, Montez and a vocational expert testified; Montez was represented by his attorney.  On October 31, 2022, the ALJ denied his application in a written decision.  On November 11, 2022, Montez appealed to the Social Security Appeals Council for review of the ALJ's decision.  On January 4, 2023, the Appeals Council denied his request for review, and the ALJ's decision thus became the final decision of the Commissioner.[8]

On April 14, 2023, Montez brought this action seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  On November 24, 2022, Montez filed his opening brief requesting that the Commissioner's decision be vacated and his claim for

---

[3] *Id.* at 104.

[4] *Id.*

[5] *Id.* at 78.

[6] *Id.* at 78, 94–95, 229, 258.

[7] Pl. Br. at 7, ECF No. 7; Tr. at 230, 246.

[8] *See Masterson v. Barnhart*, 309 F.3d 267, 271 (5th Cir. 2002) ("The ALJ's decision thus became the Commissioner's final and official decision when the Appeals Council denied [the claimant's] request for review on the merits.").

disability benefits be remanded for further administrative proceedings.  Pl.'s Br. at 23.  On December 27, 2022, the Commissioner filed a response brief in support of his decision.  Br. in Support of Comm'r's Decision [hereinafter, "Def.'s Resp."], ECF No. 16.  Montez did not file a reply brief.

## II.   ALJ'S FINDINGS AND CONCLUSIONS

Eligibility for disability insurance benefits requires that the claimant be disabled.  42 U.S.C. § 423(a)(1)(E).  Disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* § 423(d)(1)(A).  "A claimant has the burden of proving he suffers from a disability."  *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018).

To determine disability, the Commissioner uses a sequential, five-step approach, which considers:

> (1) whether the claimant is presently performing substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from doing past relevant work; and (5) whether the impairment prevents the claimant from performing any other substantial gainful activity.

*Kneeland v. Berryhill*, 850 F.3d 749, 753 (5th Cir. 2017) (cleaned up); *see also* 20 C.F.R. § 404.1520(a)(4).  "The burden of proof is on the claimant at the first four steps," *Kneeland*, 850 F.3d at 753, and if he gets past these steps, "the burden shifts to the Commissioner on the fifth step to prove the claimant's employability," *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021).  A determination at any step that the claimant is disabled or is not disabled "ends the inquiry."  *Id*.

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity ("RFC").  *Kneeland*, 850 F.3d at 754.  "The claimant's RFC

assessment is a determination of the most [he] can still do despite his . . . physical and mental limitations and is based on all relevant evidence in the claimant's record." *Id.* (cleaned up); *see also* 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1). "The RFC is used in both step four and step five to determine whether the claimant is able to do h[is] past work or other available work." *Kneeland*, 850 F.3d at 754.

Here, the ALJ evaluated Montez's claims for disability insurance benefits pursuant to the five-step sequential evaluation process. The ALJ found, as a threshold matter, that Montez's last date insured is December 31, 2026. Tr. at 39. At step one, the ALJ found that Montez has not engaged in substantial gainful activity since October 6, 2021, his alleged disability onset date. *Id.* At step two, the ALJ determined that Montez has the following severe impairments: obesity; right shoulder bicep tear and fibromatosis; obstructive sleep apnea; insomnia and headaches; major depressive disorder; schizoaffective disorder; post-traumatic stress disorder; and anxiety. *Id.*

At step three, the ALJ found that Montez does not have an impairment or combination of impairments that meets or medically equals a listed impairment for presumptive disability: specifically, Montez does not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, including Listings 1.18 (abnormality of a major joint(s) in any extremity); 3.09 (chronic pulmonary hypertension); 4.02 (chronic heart failure); 12.02 (neurocognitive disorders); 12.03 (schizophrenia spectrum and other psychotic disorders); 12.04 (depressive, bipolar and related disorders); 12.06 (anxiety and obsessive-compulsive disorders), and 12.15 (trauma- and stressor-related disorders). Tr. at 40–41.

Next, before going to step four, the ALJ determined Montez's RFC.  He determined that Montez retained the RFC to perform "light work"[9] except that he is limited to "occasional pushing and pulling with his right arm," "occasional climbing ramps and stairs, and no climbing ladders, ropes or scaffolds," "occasional stooping, kneeling, crouching and crawling," and "occasionally right arm reaching (right hand dominant)."  Tr. at 42.  Further, the ALJ determined, he is limited to "understanding remembering and carrying out simple instructions," "occasional changes in the work setting," and "occasional interaction with the public and coworkers."  *Id*.

At step four, the ALJ found that Montez is unable to perform any of his past relevant work as actually or generally performed.  Tr. at 49.  At step five, relying on the vocational expert's testimony, the ALJ found that, considering Montez's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that Montez could perform.  *Id.* at 50.  The ALJ concluded that Montez has not been under a disability since October 6, 2021 (his alleged disability onset date) through October 31, 2022 (the date of the ALJ's decision) (hereinafter, the relevant disability period) and therefore, that he is not disabled under Title II of the Social Security Act.

## III.   STANDARDS FOR JUDICIAL REVIEW

Judicial review, under § 405(g), of the Commissioner's decision denying social security benefits is "highly deferential."  *Garcia*, 880 F.3d at 704.  Courts review such a decision "only to ascertain whether (1) the final decision is supported by substantial evidence and (2) whether the Commissioner used the proper legal standards to evaluate the evidence."  *Webster v. Kijakazi*, 19

---

[9] *See* 20 C.F.R. § 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.").

F.4th 715, 718 (5th Cir. 2021) (quotation marks and citation omitted).  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Sun v. Colvin*, 793 F.3d 502, 508 (5th Cir. 2015).

In applying the "substantial evidence" standard, "the court scrutinizes the record to determine whether such evidence is present," *id.*, but it may not "try the issues *de novo*" or "reweigh the evidence," *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018).  "[N]or, in the event of evidentiary conflict or uncertainty," may the court substitute its judgment for the Commissioner's, "even if [it] believe[s] the evidence weighs against the Commissioner's decision."  *Garcia*, 880 F.3d at 704.  "Conflicts of evidence are for the Commissioner, not the courts, to resolve."  *Sun*, 793 F.3d at 508.  "A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision."  *Whitehead v. Colvin*, 820 F.3d 776, 779 (5th Cir. 2016).

## IV.   DISCUSSION

As mentioned above, the Court's review of the Commissioner's decision denying benefits is limited to two inquiries: whether the decision is supported by substantial evidence and whether the Commissioner used the proper legal standards.  *Garcia*, 880 F.3d at 704, *supra*.  Montez assigns multiple errors to the ALJ's decision—each of which sounds in a failure to use the proper legal standards.  Specifically, he argues that the ALJ erred by failing to (1) consider and evaluate, at step two, the equivalence of his headache disorder pursuant to Social Security Ruling (SSR) 19-4p; (2) consider his 100% service-connected disability rating determined by the Department of Veterans Affairs (VA); (3) base his RFC on medical opinion evidence; (4) properly evaluate his obesity; (5) incorporate, in the RFC, any limitation on interaction with

supervisors; and (6) establish, at step five, that there exists suitable work in the national or local economy that he can perform.  Below, the Court addresses each in turn.

## A.  Equivalence of Headache Disorder

Montez argues that at step three, the ALJ failed to consider that his headache disorder equals Listing 11.02, as he was required to do pursuant to SSR 19-4p.  Pl.'s Br. at 11.  This failure, he says, is a reversible error.  *Id.*

At step three of the sequential evaluation process, a claimant "has the burden of establishing that his impairment meets or equals the criteria for presumptive disability described in the listings."  *Whitehead*, 820 F.3d at 781.  "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  Establishing medical equivalency to a listing is a "high bar." *McCabe v. Comm'r of Soc. Sec. Admin.*, No. 2:22-CV-00192-DLR, 2023 WL 3080951, at *18 (D. Ariz. Apr. 4, 2023), *R & R adopted*, 2023 WL 3078661 (D. Ariz. Apr. 25, 2023).

"Primary headache disorder is not a listed impairment in the Listing of Impairments." SSR 19-4p, 2019 WL 4169635, at *7 (SSA Aug. 26, 2019).  "Epilepsy," which is listed in Listing 11.02, "is the most closely analogous listed impairment for . . . a primary headache disorder."  *Id.*; *see also* 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 11.00H1 ("Epilepsy is a pattern of recurrent and unprovoked seizures that are manifestations of abnormal electrical activity in the brain," and in adults, "tonic-clonic seizures and dyscognitive seizures" are the "most common" types of potentially disabling seizures.).  A "primary headache disorder, alone or in combination with another impairment(s)," may be presumptively disabling, if it "exhibit[s] equivalent signs and limitations to those detailed in [L]isting 11.02," in particular, as relevant here, in that

listing's "paragraph B . . . for dyscognitive seizures."  SSR 19-4p, 2019 WL 4169635, at *7.[10]  In turn, that paragraph requires that "dyscognitive seizures" must "occur[] at least once a week for at least 3 consecutive months . . . despite adherence to prescribed treatment."  20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 11.02B (citations omitted).

 Here, at step two, the ALJ found that Montez's headaches constituted a severe impairment.  Tr. at 39.  On that basis, the Commissioner concedes that Montez's headaches were a primary headache disorder and not simply a symptom of other impairments.[11]  Def.'s Resp. at 8.  Montez correctly points out that in his discussion at step three, the ALJ failed to address whether Montez's headaches meet or equal Listing 11.02, even though the ALJ discussed all other impairments that he found were severe at step two.  *See* Pl.'s Br. at 11.  That failure, Montez argues, is an error.  *Id.*

To be sure, elsewhere in his written decision, the ALJ cited considerable evidence about Montez's headaches in assessing Montez's RFC, *see e.g.*, Tr. at 45–46, and states that his headaches, along with other impairments, "have been considered as reflected by a limitation of the claimant to less than a full range of light work, with additional restrictions," *id.* at 48.  So, it is not clear why the ALJ did not discuss whether Montez's headaches meet or equal Listing 11.02.  The ALJ's feature step-three finding that Montez "does not have an impairment or

---

[10] "Dyscognitive seizures are characterized by alteration of consciousness without convulsions or loss of muscle control." 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 11.00H1b.  "During the seizure, blank staring, change of facial expression, and automatisms (such as lip smacking, chewing or swallowing, or repetitive simple actions, such as gestures or verbal utterances) may occur." *Id.*

[11] Primary headache disorders "occur independently and are not caused by another medical condition," *Howard v. Kijakazi*, No. CV 23-00138 JMS-RT, 2023 WL 6141372, at *3 n.5 (D. Haw. Sept. 20, 2023), whereas secondary headaches are "symptoms of another medical condition," SSR 19-4p, 2019 WL 4169635, at *3.  Examples of primary headache disorders include "migraine headaches, tension-type headaches, and cluster headaches," *id.* at *2, and examples of secondary headaches include "headache[s] attributed to trauma or injury to the head or neck or to infection," *id.* at *5.  For purposes of SSR 19-4p, the agency considers "only a primary headache disorder," but not secondary headaches.  *Id.*

combination of impairments that meets or medically equals the severity of one of the listed impairments" suggests that he considered Montez's headaches but perhaps believed that the record evidence did not support that they meet or equal Listing 11.02.  *See* SSR 17-2p, 2017 WL 3928306, at *4 (SSA Mar. 27, 2017) ("If an adjudicator . . . believes that the evidence already received in the record does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, the adjudicator is not required to articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment.").

Be that as it may, an ALJ's step-three error in failing to explicitly consider a listed impairment is harmless, and therefore, remand is not warranted—unless the claimant can show that the record evidence supports that his impairment meets or medically equals in severity the listed impairment.  *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) ("Having determined that the ALJ erred in failing to state any reason for her adverse determination at step 3, we must still determine whether this error was harmless."); *Hurst v. Colvin*, 639 F. App'x 1018, 1021–22 (5th Cir. 2016) (stating "*Audler* . . . does not stand for the proposition that the ALJ's failure to address a claimant's argument always warrants remand" and concluding "that the ALJ's failure to explicitly consider section 8.05 was harmless error").[12]

Montez argues that the ALJ's failure to evaluate and consider Listing 11.02 is not harmless because the record evidence supports a finding that his headaches medically equal

---

[12] *See also Vance v. Berryhill*, 860 F.3d 1114, 1118 (8th Cir. 2017) ("An ALJ's failure to address a specific listing or to elaborate on his conclusion that a claimant's impairments do not meet the listings is not reversible error if the record supports the conclusion.'"); *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (concluding the ALJ's step-three error was harmless because the claimant failed to show that his impairments met or medically equaled in severity any listed impairment); *Tammy M. v. Kijakazi*, No. CV 22-10949-FDS, 2023 WL 5353337, at *7 (D. Mass. Aug. 21, 2023) ("[A]n ALJ's failure to cite an applicable SSR," such as SSR 19-4p, "does not establish reversible error in the absence of any showing that the decision is materially inconsistent with the regulation.").

Listing 11.02B.  Pl.'s Br. at 11, 13.  To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, the agency adjudicators consider:

> A detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

SSR 19-4p, 2019 WL 4169635, at *7.  For multiple reasons, discussed *ante*, the Court is not persuaded by Montez's argument.

In support of his argument, Montez points out that he was exposed to "multiple explosions" while he was deployed in Afghanistan and "these" explosions resulted in him suffering a loss of consciousness and alteration of consciousness.  Pl.'s Br. at 12 (citing Tr. at 802); *see also* 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 11.00H1b ("Dyscognitive seizures are characterized by alteration of consciousness without convulsions or loss of muscle control."). According to the medical records, Montez reported that he was deployed in Afghanistan in 2015-16; he experienced head injuries twice: once, from an IED explosion, and later, from a fall from a platform; immediately after the IED explosion, he lost consciousness for a few minutes and then felt dazed and disoriented; and he did not lose consciousness from the fall.  Tr. at 802, 805, 807.  But Montez fails to point to any evidence that he suffered from a loss of consciousness due to his headaches during the relevant disability period.  *Cf.* 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, §

- 10 -

11.00H1b ("The required number of seizures must occur *within the period* we are considering in connection with your application or continuing disability review." (emphasis added)).[13]

Montez next points to his responses to a set of questions asked of him in July 2022 for purposes of screening for traumatic brain injury (TBI). Based on his self-reported symptoms, he was diagnosed with "history of [mild] TBI," "headache, unspecified," and post-traumatic stress disorder; for his headache, he was placed on a treatment plan. Tr. at 809–10, 831, 849–50, 859.[14] The screening questions asked him to rate—using a scale of none, mild, moderate, severe, and very severe[15]—certain neurobehavioral symptoms he experienced over the last 30 days. *Id.* at 805. As relevant here, he reported that he experienced mild nausea, moderate vision problems

---

[13] *Compare, e.g.*, *T.B.M. v. Kijakazi*, No. 22-2096-DDC, 2023 WL 2587285, at *6 (D. Kan. Mar. 21, 2023) (finding that plaintiff's chronic headaches did not meet or medically equal the specific medical criteria of Listing 11.02B in part because the plaintiff "never reported that her headaches caused an alteration of consciousness"), *with Tamra A.W. v. Kijakazi*, No. 22-CV-1099-JAR, 2023 WL 2784854, at *4–*5 (D. Kan. Apr. 5, 2023) (stating that a showing of the "alteration of consciousness" symptom is not required to establish that a primary headache disorder equals Listing 11.02B).

[14] Based on the screening, a CT scan of his brain was ordered to further assess his headache, Tr. at 859, and on July 19, 2022, the scan was performed, Tr. at 786–87. As the ALJ noted in his written decision, the scan "showed an essentially normal CT of the brain, with mild atrophy of the frontal lobes, possibly secondary to microvascular disease or substance abuse." *Id.* at 45 (citing *id.* at 787).

[15] The scale is described as follows:

None 0 - Rarely if ever present not a problem at all.

Mild 1 - Occasionally present but it does not disrupt activities[;] I can usually continue what I am doing; [it] does not really concern me.

Moderate 2 - Often present, occasionally disrupts my activities; I can usually continue what I am doing with some effort; I am somewhat concerned.

Severe 3 - Frequently present and disrupts activities; I can only do things that are fairly simple or take little effort; I feel like I need help.

Very Severe 4 - Almost always present and I have been unable to perform at work, school, or home due to this problem; I probably cannot function without help.

Tr. at 805–06.

(blurring, trouble seeing); moderate sensitivity to light; moderate forgetfulness (can't remember

things); and severe "slowed thinking, difficulty getting organized, can't finish things." *Id.* at

806.  Montez argues that these symptoms at the rated degrees establish a perception of alteration

of consciousness that is equivalent to a dyscognitive seizure.  Pl.'s Br. at 12.  However, he fails

to connect these symptoms to his headache disorder—whether these symptoms were caused by

his headaches and not by "alternative medical" conditions.  SSR 19-4p, 2019 WL 4169635, at

*6.

Moreover, Montez fails to direct the Court to any detailed description by an acceptable

medical source of "a typical headache event, including all associated phenomena" or "limitations

in functioning that may be associated with the primary headache disorder, such as interference

with activity during the day."  SSR 19-4p, 2019 WL 4169635, at *7; *cf. also* 20 C.F.R. Pt. 404,

Subpt. P, Appx. 1, § 11.02H2 ("We require at least one detailed description of your seizures

from someone, preferably a medical professional, who has observed at least one of your typical

seizures.").  Nor does the record contain any medical opinions or administrative medical findings

that Montez's headache disorder equals Listing 11.02B.[16]

Finally, the record does not suggest that Montez's headaches meet the requisite frequency

and duration criteria.  *See* 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 11.02B (providing that

dyscognitive seizures must "occur[] at least once a week for at least 3 consecutive months . . .

despite adherence to prescribed treatment." (cross-citing *id.* §§ 11.00H4 and 11.00C).  The dates

---

[16] *See also* SSR 17-2p, 2017 WL 3928306, at *3 ("To demonstrate the required support of a
finding that an individual is disabled based on medical equivalence at step 3, the record must contain one
of the following: 1. A prior administrative medical finding from [a state agency medical or psychological
consultant] from the initial or reconsideration adjudication levels supporting the medical equivalence
finding, or 2. [Medical expert] evidence, which may include testimony or written responses to
interrogatories, obtained at the hearings level supporting the medical equivalence finding, or 3. A report
from the [Appeals Council]'s medical support staff supporting the medical equivalence finding.").

of the medical records referencing Montez's headaches span from July 5, 2022, to September 14,

2022; those records are from a VA clinic.  Tr. at 819, 857.  According to those records, on July 5,

2022, Montez reported that he had frequent headaches occurring almost every other day.  *Id.* at

857.  On July 22, 2022, he reported that he experienced 3-4 headaches a week and that a possible

trigger for his headaches was light.  *Id.* at 807.  And on August 12, 2022, nonprescription filter

glasses for indoor use were recommended to assist him with the management of triggers for

headaches, *id.* at 839, and one pair of such glasses was ordered for him, *id.* at 798, 819.  On

September 14, 2022, Montez reported that he received the glasses and had been using them

indoors "with positive changes in headache induced dizziness."  *Id.* at 819.

There is no medical record or other evidence describing the frequency of his headaches or

the signs/symptoms of Montez's headaches—after he had started using the filter glasses

sometime between August 12 and September 14, 2022.  At the hearing held on October 17, 2022,

Montez did not testify about his headaches.  So, the record does not suggest that Montez

experienced headaches at the frequency and for the duration required by Listing 11.02B.  *See* 20

C.F.R. Pt. 404, Subpt. P, Appx. 1, § 11.00H4 ("The period specified in 11.02A, B, C, or D

*cannot begin earlier than one month after you began prescribed treatment*.  The required number

of seizures must occur within the period we are considering in connection with your application

or continuing disability review.  When we evaluate the frequency of your seizures, we also

consider your adherence to prescribed treatment." (emphasis added)).[17]

In sum, the Court finds that Montez has failed to demonstrate, and the record evidence

does not support, that Montez's headaches equal Listing 11.02B.  Consequently, any error on the

part of the ALJ for not explicitly considering his headaches at step three was harmless; remand is

---

[17] *See also Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987) ("A medical condition that can
reasonably be remedied either by surgery, treatment, or medication is not disabling.").

not warranted on this ground.  *See Thomas H. v. Kijakazi*, No. 3:22-CV-50331, 2023 WL

6388145, at *3 (N.D. Ill. Sept. 29, 2023) (An ALJ's failure to "properly analyze medical

equivalency as outlined in SSR 19-4p" does not warrant remand where the court is "convinced

that the ALJ will reach the same result.").

**B.  VA Rating**

In January 2022, the VA notified Montez of its determination that effective October 7,

2021, he became "disabled" due to one or more service-connected disabilities and rated his

combined service-connected disability at 100%.  Tr. at 351.  Montez faults the ALJ for not

discussing the VA rating in his written decision.  Pl.'s Br. at 8.  He contends that under the Fifth

Circuit case law, the ALJ was required to consider the VA's 100% disability finding and accord

it "great weight."  *Id.*  In support, he relies on several lower court decisions issued between 2004

and 2010.  *Id.* at 7; *see also Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001) (stating a

VA disability determination should generally be accorded "great weight" unless "ALJs

adequately explain the valid reasons for not doing so").

The Commissioner correctly points out that Montez relies on outdated case law.  Def.'s

Resp. at 7.  In early 2017, the Social Security Administration (SSA) broadly revised its rules

regarding the evaluation of medical evidence and those new rules are applicable to claims filed

on or after March 27, 2017.[18]  One such regulation provides that for such claims, the SSA

adjudicators "will not provide any analysis in [their] determination or decision about a decision

made by" other governmental agencies "such as the [VA]."  20 C.F.R. § 404.1504.  This is

because the VA "makes disability. . . and other benefits decisions for [its] own programs using

---

[18] *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844,
2017 WL 168819 (SSA Jan. 18, 2017), *amended by* 82 Fed. Reg. 15,132, 2017 WL 1105368 (SSA Mar.
27, 2017).

[its] own rules," and they are not "binding" on the SSA adjudicators.  *Id.*  Still, an adjudicator is required to "consider all of the supporting evidence underlying" a VA decision, if such evidence is in the claim record.  *Id.*  Nevertheless, according to another regulation, the SSA adjudicators "will not provide any analysis about how [they] considered" in their determination or decision, any decisions by other governmental agencies, such as the VA.  *Id.* § 404.1520b(c)(1).  This is because other agencies' decisions are "inherently neither valuable nor persuasive."  *Id.* § 404.1520b(c).

Because the SSA has statutory authority to adopt rules, such as the new regulations discussed above, regarding "the nature and extent of the proofs and evidence . . . in order to establish the right to benefits," 42 U.S.C. § 405(a), the prior case law relied upon by Montez has been superseded by these regulations.  And because Montez's disability benefits claim was filed in February 2022, the new regulations apply to his claim, and therefore, the ALJ did not err by failing to discuss how he considered Montez's VA disability rating.  *See Kitchen v. Kijakazi*, 82 F.4th 732, 739 (9th Cir. 2023) ("Put simply, the 2017 regulations removed any requirement for an ALJ to discuss another agency's rating.  Thus, it was not error for the ALJ to exclude [the claimant's] VA disability rating from her analysis."); *id.* at 738–39 (declining to follow *McCartey v. Massanari*, 298 F.3d 1072 (9th Cir. 2002)—wherein the Ninth Circuit previously agreed with the approach of, *inter alia*, the Fifth Circuit and held that in a social security disability benefits case, "an ALJ must ordinarily give great weight to a VA determination of disability" and holding that the ALJ in that case erred because he "failed to consider the VA finding [that the claimant was 80% disabled] and did not mention it in his opinion" (citing *Chambliss*, 269 F.3d at 522)); *Rogers v. Kijakazi*, 62 F.4th 872, 879–80 (4th Cir. 2023) (declining to follow the Fourth Circuit's prior precedents that required ALJs to consider and

discuss VA disability ratings, reasoning that "[t]he new rules supersede our precedents and thus apply to claims filed on or after March 27, 2017," and holding that the ALJ in that case "committed no error in adhering to the new rules and declining to accord substantial weight to the VA's determination that [the claimant] is 100% disabled").

Relatedly, Montez argues that the ALJ erred because nowhere in his decision does the ALJ consider the medical opinion evidence contained within the VA records and because the ALJ failed to evaluate, rather than "cherry pick," the VA medical evidence. Pl.'s Br. at 8. He parades several pieces of evidence from the VA records, apparently faulting the ALJ for not discussing them in his decision. *Id.* The Court disagrees.

Here, the VA records, which include the evidence underlying the VA's disability determination, are contained in Exhibit 1F; that exhibit spans 92 pages. Tr. at 339–430. Throughout his written decision, the ALJ cited various medical notes from that exhibit and discussed medical evidence therefrom. *E.g.*, *id.* at 39 (discussing Dr. Jiang Shan's notes regarding Montez's hand impairments and Montez's 2017 diagnosis of right carpal tunnel syndrome (citing Ex. 1F/77)); *id.* at 42 (discussing the result of a digital diagnostic portable type 3 device home sleep test (citing Ex. 1F/48)); *id.* at 42–43 (discussing an MRI of Montez's right shoulder and X-rays of his right knee and right elbow (citing Ex. 1F/41–48)); *id.* at 43 (discussing a Disability Benefits Questionnaire that Dr. Shan completed on March 9, 2021 (citing Ex. 1F/19–33 and Ex. 1F/56–64)). The ALJ expressly noted Dr. Shan's statement that "the claimant was limited with prolonged[] walking, standing or sitting for more than 30 minutes, and no heavy lifting or carrying for anything more than 30 pounds" and that he "had difficulty with bending over." *Id.* at 43 (citing Ex. 1F/33).

Thus, it is clear that the ALJ considered the evidence underlying the VA's disability determination. To the extent that the ALJ omitted discussing certain pieces of evidence from the VA records that Montez recites, that omission does not mean that he did not actually consider them. *See Castillo v. Barnhart*, 151 F. App'x 334, 335 (5th Cir. 2005) ("That the ALJ did not specifically cite each and every piece of medical evidence considered does not establish an actual failure to consider the evidence."); *see also Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (rejecting as unnecessary rule requiring ALJ to specifically articulate evidence that supported his decision and discuss evidence that was rejected); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("[A]n ALJ need not mention every piece of evidence" in his written decision.). Moreover, Montez fails to explain how the omitted pieces of evidence contradict other pieces of evidence that the ALJ expressly considered. *See Martinez v. Kijakazi*, No. EP-22-CV-00135-KC-ATB, 2023 WL 2885402, at *9–*10 (W.D. Tex. Apr. 5, 2023) ("The prohibition against cherry-picking evidence is a court-created doctrine" that "require[s] the ALJ to expressly discuss, in his written decision, *countervailing* evidence that undermines his finding on nondisability, when he relies on other evidence that supports that finding." (emphasis added)), *R & R adopted*, 2023 WL 3028103 (W.D. Tex. Apr. 20, 2023).

The Court finds that Montez has failed to demonstrate that the ALJ erred by not discussing his VA disability rating or by not considering the evidence underlying the VA's disability determination. The Court overrules Montez's assignment of error on this ground.

## C.  Basis of the RFC Formulation

Montez argues that the ALJ erred by failing to base the RFC on medical opinion evidence. Pl. Br. at 14. His argument turns on to what extent, if at all, the ALJ relied on (1) the prior administrative medical findings made by Eduardo Haim, M.D., in March 2022 (at the initial

stage), Tr. 107–09; (2) the prior administrative medical findings made by Hope Folarin, M.D., in May 2022 (at the reconsideration stage), *id.* at 116–19; and (3) Dr. Shan's medical opinion about Montez's back condition which Dr. Shan provided in a Disability Benefits Questionnaire that he completed for the VA in February 2021, *id.* at 353–71.

To be clear, Montez does not argue that the ALJ inadequately articulated the persuasiveness of these findings and opinions or that the ALJ's articulation is not supported by substantial evidence.  *Cf.* 20 C.F.R. § 404.1520c(b) (providing how an ALJ must articulate his consideration of medical opinions and prior administrative medical findings); *cf. also Rodriguez v. Kijakazi*, No. EP-22-CV-00357-FM-ATB, 2023 WL 5808388, at *11 (W.D. Tex. Aug. 22, 2023) ("The doctrine of harmless error applies to an ALJ's failure to comply with § 404.1520c's articulation requirements."), *R & R adopted*, 2023 WL 5814389 (W.D. Tex. Sept. 7, 2023). Instead, Montez argues that these findings and opinions constitute the only medical opinions of record and that the ALJ rejected all of them.  Pl.'s Br. at 15–16.  As a result, Montez continues, the ALJ used his own opinion to assess his RFC, and that was an error.  *Id.*  Moreover, he speculates that had the ALJ properly considered Dr. Shan's opinion, the RFC would have been formulated to reflect his extensive physical limitations and a finding of disability would have occurred.[19]  *Id.* at 16.

Turning first to the state agency medical consultants' findings, the ALJ wrote the following:

> The undersigned has considered the prior administrative medical findings of the State Agency medical consultants (Exhibits 1A and 3A).  Their findings are *not persuasive.  While they are supported by their review of the medical evidence available to them at the time of each review*, they are not consistent with additional medical evidence received at the hearing level, which establishes that the claimant

---

[19] Because Montez's feature complaint is about physical limitations, the Court will limit its discussion to physical RFC findings and opinions.

is more limited by his impairments than was previously determined (Exhibits 6F and 7F).

Tr. at 49 (emphasis added).  Because the ALJ found those findings are "not persuasive," Montez argues that the ALJ rejected them *in toto*.  *See* Pl.'s Br. at 15–16.  However, as the Commissioner points out, *see* Def.'s Br. at 11, the ALJ's physical RFC formulation differs from Dr. Folarin's physical RFC findings only in respect to postural limitations: whereas Dr. Folarin found that Montez had no postural limitations, the ALJ found that he is limited "to occasional climbing ramps and stairs, and no climbing ladders, ropes or scaffolds" and "to occasional stooping, kneeling, crouching and crawling."  *Compare* Tr. at 116–17, *with id.* at 42.  Thus, the ALJ included more restrictive limitations in the RFC than Dr. Folarin did.[20]  Because the ALJ's RFC formulation incorporates the vast majority of the limitations Dr. Folarin assessed and the ALJ found that Dr. Folarin' findings were "supported by [his] review of the medical evidence available to [him] at the time of [his] review," *id.* at 49, it is reasonable to infer that the ALJ meant to say that Dr. Folarin's physical RFC findings, at a minimum, were "partially persuasive" or alternatively, that despite finding them "not persuasive," the ALJ implicitly relied on them in formulating the RFC.

Turning to Dr. Shan's medical opinion, under a section, entitled "functional impact," of the Disability Benefits Questionnaire, he responded "Yes" to the question, "regardless of the Veteran's current employment status, do the conditions listed in the diagnosis section impact his/her ability to perform any type of occupational task (such as standing, walking, lifting, sitting etc.)?"  Tr. at 371.  Below that response, Dr. Shan stated: "limited with prolonged walking,

---

[20] *Cf., e.g.*, *Baker o/b/o Baker v. Berryhill*, No. 1:15-CV-00943-MAT, 2018 WL 1173782, at *4 (W.D.N.Y. Mar. 6, 2018) ("Remand is generally not warranted where the ALJ's RFC finding is more restrictive than the limitations set forth in the medical opinions of record, inasmuch as any alleged error in this regard inures to the claimant's benefit.").

standing or sitting for more than 30 minutes, difficulty bending over, no heavy lifting or carrying more than 30 lbs." *Id.*  In his written decision, the ALJ discussed this and several other statements Dr. Shan made in the Disability Benefits Questionnaire. *Id.* at 43.  The ALJ wrote: "Dr. Shan noted the claimant was limited with prolonged[] walking, standing or sitting for more than 30 minutes, and no heavy lifting or carrying for anything more than 30 pounds.  He stated the claimant had difficulty with bending over (Exhibit 1F/33)." *Id.*

The ALJ did not articulate how persuasive he found Dr. Shan's above-quoted statements to be, but as the Commissioner points out, the ALJ's RFC formulation is consistent with Dr. Shan's opinion that Montez is limited with "no heavy lifting or carrying for anything more than 30 pounds" and he "had difficulty with bending over." Def. Br. at 10.  Specifically, the ALJ limited Montez to "light work," which involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," 20 C.F.R. § 404.1567(b), and further limited him to "occasional stooping, kneeling, crouching and crawling," *see* SSR 85-15, 1985 WL 56857, at *7 (SSA 1985) (describing "stooping" as "bending the body downward and forward by bending the spine at the waist," "kneeling" as "bending the legs at the knees to come to rest on one or both knees," and "crouching" as "bending the body downward and forward by bending both the legs and spine," as well as explaining "crawling on hands and knees and feet is a relatively rare activity even in arduous work").  This consistency, in light of the fact that none of the state agency medical consultants found that Montez had any postural limitations, *see* Tr. at 108, 117, suggests that in formulating the RFC, the ALJ relied on Dr. Shan's opinion.[21]

---

[21] *Cf. Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) (In assessing residual functional capacity, "there is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question.").

All these persuade the Court that in formulating the RFC, the ALJ relied on Dr. Folarin's RFC findings, Dr. Shan's medical opinion, as well as various medical records, which the ALJ narrated throughout his written decision.  Tr. at 42–49; *see also Rounds v. Comm'r, Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015) ("[T]he ALJ is responsible for translating and incorporating clinical findings into a succinct RFC."); *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole.").  The Court therefore is not persuaded by Montez's argument that the ALJ erred by failing to base the RFC on medical opinion evidence.

Relatedly, Montez recites three statements that Dr. Shan made elsewhere in the Disability Benefits Questionnaire and faults the ALJ for not mentioning and considering them in his written decision.  Pl. Br. at 16.  The Court has carefully compared these statements against the ALJ's narration of the information from the Questionnaire and finds that with one exception, the ALJ mentioned the statements Montez points out, and he did so by accurately paraphrasing them.  For example, whereas Montez points out that Dr. Shan noted that Montez had "reduced range of motion to 30 degrees on forward flexion, 25 degrees on left lateral flexion and 20 degrees on extension and right lateral flexion," Pl.'s Br. at 16—the ALJ wrote that "[e]xamination revealed decreased lumbar spine range of motion with pain, Tr. at 43 (citing Ex. 1F/23, *i.e.*, Tr. at 361).  As another example, whereas Montez points out that Dr. Shan noted that Montez had "decreased sensation in the right thigh, right lower leg and ankle, and right foot and toes," Pl.'s Br. at 16— the ALJ wrote that "[s]ensation was decreased in the right lower extremity and normal in the left lower extremity," Tr. at 43 (citing Ex. 1F/28, *i.e.*, Tr. at 366).

The ALJ did not mention Dr. Shan's statement about "flare-ups" of Montez's back that Montez points out, Pl.'s Br. at 16, but the ALJ cited another statement—that Montez "was diagnosed with a lumbosacral strain in February 2016"—from the same page on which the "flare-up" statement appears, Tr. at 43 (citing Ex. 1F/19, *i.e.*, Tr. at 357). The Court therefore rejects Montez's argument that the ALJ failed to consider Dr. Shan's statements. *See Castillo*, 151 F. App'x at 335, *supra* ("That the ALJ did not specifically cite each and every piece of medical evidence considered does not establish an actual failure to consider the evidence.").[22]

In sum, the Court finds that in formulating the RFC, the ALJ relied on Dr. Shan's medical opinion and some of the prior administrative findings, and considered the medical evidence contained in Dr. Shan's notes. The Court overrules Montez's assignment of error on this ground.

## D.  Obesity

Montez argues that the ALJ erred by failing to resolve internal inconsistencies related to the ALJ's assessment of his obesity and by failing to properly evaluate his obesity under SSR 19-2p. Pl.'s Br. at 17. He speculates that had the ALJ provided an appropriate analysis, a finding of sedentary work with other limitations (albeit unspecified) would have occurred—leading to a finding of disability. *Id.* at 18.

---

[22] *Compare Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995) (stating "[u]sually, the ALJ should request a medical source statement describing the types of work that the applicant is still capable of performing," and remanding with instructions for the ALJ in that case "to obtain a report from a treating physician regarding the effects of Ripley's back condition upon his ability to work"), *with Avery v. Colvin*, 605 F. App'x 278, 282 n.3 (5th Cir. 2015) (distinguishing *Ripley* reasoning that in *Ripley*, "the record did not clearly establish the effect of Ripley's condition on his ability to work" and "there was no report from a treating physician regarding Ripley's ability to work," but in the case at hand, "[w]e do not have that situation" because "the record establishes Avery's ability to work" and "the record contains a medical opinion by Avery's treating physician that was considered by the ALJ in rendering his decision").

"Obesity is a complex disorder characterized by an excessive amount of body fat," and "is often associated with musculoskeletal, respiratory, cardiovascular, and endocrine disorders." SSR 19-2p, 2019 WL 2374244, at *2–*3 (SSA May 20, 2019).  "[O]besity has been removed as a standalone listing from [20 C.F.R. Part 404, Subpart P,] Appendix 1's list of disabling impairments."  *Brown v. Colvin*, 845 F.3d 247, 251 (7th Cir. 2016).  The SSA's policy statements "do[] not mandate any additional restrictions or a finding of disability" on account of obesity.  *Johnson v. Comm'r, SSA*, 764 F. App'x 754, 758 (10th Cir. 2019) (discussing SSR 02-1p, the predecessor to SSR 19-2p).[23]

Nevertheless, "the ALJ must still consider its impact when evaluating the severity of other impairments."  *Stephens v. Berryhill*, 888 F.3d 323, 328 (7th Cir. 2018); *see also* SSR 19-2p, 2019 WL 2374244, at *3 (A "person's obesity, alone or in combination with another impairment(s)," can be "severe.").  Further, "an ALJ must consider the claimant's obesity, in combination with other impairments, . . . when assessing [his] residual functional capacity," *Shilo v. Comm'r of Soc. Sec.*, 600 F. App'x 956, 959 (6th Cir. 2015) (cleaned up), precisely because "[t]he combined effects of obesity with another impairment(s) may be greater than the effects of each of the impairments considered separately," SSR 19-2p, 2019 WL 2374244, at *4.[24]  SSR 19-2p calls for "an individualized assessment of the effect of obesity on a person's

---

[23] *See also Medrano v. Astrue*, No. A-09-CA-584-SS, 2010 WL 2522202, at *6 (W.D. Tex. June 17, 2010) ("SSR 02-1p does not state obesity necessarily causes any additional function limitations; rather, it provides obesity *can* cause such limitations." (citing SSR 02-1p, 2000 WL 628049, at *6 (SSA Sept. 12, 2002))).

[24] *See also Goins v. Colvin*, 764 F.3d 677, 681 (7th Cir. 2014) ("Like most obese people, the plaintiff can walk.  Her obesity is not disabling in itself.  But it is an added handicap for someone who has degenerative disc disease."); *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011) ("It is one thing to have a bad knee; it is another thing to have a bad knee supporting a body mass index in excess of 40."); SSR 19-2p, 2019 WL 2374244, at *4 ("[S]omeone who has obesity and arthritis affecting a weight-bearing joint may have more pain and functional limitations than the person would have due to the arthritis alone.").

functioning." *Id.* ("We will not make general assumptions about the . . . functional effects of obesity combined with another impairment(s). . . . We evaluate each case based on the information in the case record.").

Here, in his written decision, the ALJ noted, citing various medical records, Montez's weight and body mass index (BMI) as they varied throughout the relevant disability period: his weight varied from 239.6 pounds to 242.5 pounds, and his BMI varied from 35.5 to 35.94. *E.g.*, Tr. at 44 (citing *id.* at 653 (Jan. 5, 2022)), 46 (citing *id.* at 767 (August 24, 2022)). After narrating various medical records relating to Montez's other impairments and symptoms, the ALJ wrote, toward the end of his RFC analysis, the following about Montez's obesity:

> While the record shows that the claimant has a body mass index consistent with a diagnosis of obesity, *there is no evidence that the claimant has any associated symptoms related to this diagnosis*. There is no evidence of hypertension, lower extremity weight bearing joint problems, diabetes or cardiac disease.

*Id.* at 48 (emphasis added). Montez takes issue with the ALJ's statement *italicized* above.

Specifically, Montez advances two arguments. First, he argues that the ALJ's statement that "there is no evidence that the claimant has any associated symptoms related to this diagnosis" is inconsistent with his earlier step-two finding that his obesity is a severe impairment. Pl.'s Br. at 17 (arguing "the ALJ found obesity to be a severe impairment but then, when formulating the RFC, the ALJ found that "there is no evidence that the claimant has any symptoms related to this diagnosis"). He adds that it is not clear what limitations, if any, were assessed based on his obesity. *Id.* Montez seems to say that the ALJ used the word "symptoms" to mean "limitations."[25] He further seems to posit that a step-two finding that an impairment is

---

[25] Under the regulations, "symptoms," "signs," and "limitations" are terms of art. *See, e.g.* 20 C.F.R. §§ 404.1502(g), (i).

severe must necessarily lead to an RFC limitation based on that severe impairment.  Second, more broadly, he argues that the ALJ did not analyze his limitations under SSR 19-2p.  *Id.*

As an initial matter, the Court observes that the ALJ's statement that there is no evidence that Montez has any "symptoms"—or as Montez puts it, "limitations"—related to the diagnosis of his obesity is supported by substantial evidence.  Although the medical records mention the diagnosis, they include no detail regarding his obesity or any limitations caused by his obesity.  *See, e.g.*, Tr. at 660–61.  For example, the progress notes regarding an "exercise and obesity screening" conducted on January 5, 2022, indicate that a nurse discussed with him the health risks of obesity and recommended referral for a weight loss program, but he refused the referral.  *Id.* at 661.  He was also advised on the benefits of regular exercise.  *Id.* at 660–61.  The notes contain no statement of functional limitations caused by his obesity.  Moreover, at the hearing before the ALJ, Montez's counsel downplayed any effect of his obesity.  *Id.* at 76 (describing the medical records as showing that "there has been a diagnosis of . . . obesity, but really . . . the focus has been on his right-shoulder pain" (counsel statement)).[26]

Next, the Court observes that Montez confuses the roles of step two and an RFC assessment in the sequential evaluation process.  "Step two is merely a threshold determination meant to screen out weak claims"; it "is not meant to identify the impairments that should be

---

[26] The Court's review of the medical records reveals that before the relevant disability period, Montez's BMI was 33.9 in June 2016, Tr. at 354, and recently, it was 29.68 in January 2021, *id.* at 386.  Yet, both in 2016 and in 2021 (before October 6, 2021, his disability onset date), he worked as a vehicle mechanic for the Army, *id.* at 78, 229, and his earnings were at the substantial gainful activity level, *id.* at 216, 220.  At the hearing, the vocational expert testified that his past relevant work of "Equipment Mechanic (Military Service)" (DOT No. 620.261-022) was medium level work as generally performed, but heavy work as actually performed by him, *id.* at 98.  This evidence suggests that any effect Montez's obesity has on his ability to work is not as limiting as he makes it out to be.  *See Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) ("[A]bility to work despite pre-existing condition supports ALJ's finding of not disabled." (citing *Fraga v. Bowen*, 810 F.2d 1296, 1305 n.11 (5th Cir. 1987))).

taken into account when determining the RFC." *Buck v. Berryhill*, 869 F.3d 1040, 1048–49 (9th Cir. 2017).  At step two, an ALJ determines whether the claimant has a medically severe impairment—that is, an impairment that is anything more than a slight abnormality that "'would not be expected to interfere' with a claimant's ability to work," *Salmond*, 892 F.3d at 817 (quoting *Loza v. Apfel*, 219 F.3d 378, 391 (5th Cir. 2000)), or stated another way, "would have . . . more than a minimal effect on an individual's ability to work," *Keel*, 986 F.3d at 556 (citing SSR 85-28, 1985 WL 56856 (Jan. 1, 1985)).  "But at that point in the sequential evaluation process, the required showing is *de minimis* and does not account for the ALJ's assessment . . . of a claimant's ability to work at a given exertional level." *Johnson v. Berryhill*, 679 F. App'x 682, 687 (10th Cir. 2017) (cleaned up) (citing 20 C.F.R. § 404.1520(c)); *see also Salmond*, 892 F.3d at 817 ("This second step requires the claimant to make a *de minimis* showing.").  "Thus, a finding that an impairment is severe at step two is not determinative of the claimant's RFC." *Johnson*, 679 F. App'x at 687.

So, even if the ALJ did not assess any RFC limitation on account of Montez's obesity, either alone or in combination with other impairments—which is not the case here—Montez's argument about inconsistencies would be unavailing.  On the contrary, as Montez recognizes, the RFC does include such limitations: "The claimant is limited to occasional climbing ramps and stairs, and no climbing ladders, ropes or scaffolds" and "to occasional stooping, kneeling, crouching and crawling."  Tr. at 42.

But Montez attributes those limitations to his back pain *only*.  *See* Pl.'s Br. at 18.  Montez appears to argue that the ALJ did not arrive at those limitations based on his back pain in combination with his obesity.  That is in turn because, he argues, the ALJ failed to analyze these limitations under SSR 19-2p.  *Id.*  Moreover, he argues that no other potential limitations were

mentioned or discussed.  *Id.*  There are at least two problems with this characterization of the ALJ's decision.

First, implicit in Montez's argument is the premise that the ALJ was required to identify which RFC limitation corresponds to which impairment.  That is incorrect.  Although SSR 19-2p says, "[a]s with any other impairment, we will explain how we reached our conclusion on whether obesity causes any limitations," SSR 19-2p, 2019 WL 2374244, at *4; *see also* SSR 02-1p, 2000 WL 628049, *7 (predecessor to SSR 19-2p) ("As with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations."), ALJs are not required to "describe precisely which medical condition triggered each limitation," *Zimmerman v. Astrue*, 288 F. App'x 931, 935 (5th Cir. 2008) (rejecting plaintiff's argument that "the ALJ should have identified precisely which of the [plaintiff's] limitations were caused by [his] obesity").

Second, the ALJ's decision, read as a whole, suggests that the ALJ's RFC formulation includes limitations due to his obesity in combination with other impairments.  The ALJ noted, citing SSR 19-2p, that he has fully considered obesity in the context of the overall record evidence in making the RFC determination, Tr. at 40, and that his right shoulder impairment, obesity, obstructive sleep apnea and headaches have been considered as reflected by a limitation of the claimant to less than a full range of light work, with additional restrictions as set forth in the RFC, *id.* at 48.  Nothing in the ALJ's decision suggests the contrary.

Accordingly, the Court finds that Montez has failed to demonstrate that the ALJ erred in his discussion and evaluation of Montez's obesity.  The Court overrules Montez's assignment of error on this ground.

**E.  Limitations on Interaction with Supervisors**

At step three, in analyzing the "Paragraph B"[27] criteria, the ALJ found that Montez has "moderate" limitations in the functional area of interacting with others.[28]  Tr. at 41.  The ALJ stated that his RFC assessment reflects the degree of limitation he found in the "Paragraph B" mental function analysis.  *Id.* at 42.  The RFC includes a limitation that Montez "is limited to occasional interaction with the public and coworkers."  *Id.*  Montez takes issue with this limitation in that, he says, the ALJ failed to include any limitation on interaction with "supervisors."  Pl.'s Br. at 21.  This failure, Montez argues, was an error.  *Id.* at 19.

In support of his argument, Montez points to the following evidence.  Pl. Br. at 20–21.  At the hearing, he testified about, *inter alia*, his difficulty with crowds of more than five people and difficulty interacting with others, including family members.  *Id.* at 20 (citing Tr. at 47 (ALJ's written decision)).  During a mental health session, he reported that he easily gets annoyed or irritable and has trouble getting along with others.  *Id.* (same).  During another session, he reported that "[h]aving too many people around, I disappear."  Tr. at 824.

In his decision, the ALJ expressly considered the same or similar pieces of evidence Montez cites here (mentioned above).  For example, Montez's recital of his testimony is taken verbatim from the ALJ's decision.  Pl.'s Br. at 20 (citing ALJ's written decision).  Further, the ALJ noted that Montez "alleged that he has difficulty engaging in social activities, getting along

---

[27] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A2b.

[28] The area of mental functioning "interact with others" "refers to the abilities to relate to and work with supervisors, co-workers, and the public."  *Id.* § 12.00E2.  Examples include: "cooperating with others; . . . handling conflicts with others; . . . responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness."  *Id.*

with others, and spending time in crowds" and "reported being somewhat anxious when in a crowded area." Tr. at 41.

The ALJ also expressly considered countervailing evidence about his ability to interact with others. For example, the ALJ noted: "However, [Montez] also reported that he is able to live with family without any problems" and that he "was described as pleasant and cooperative and appeared comfortable during appointments." Tr. at 41 (citing *id.* at 652, 825). He also noted that during a mental status examination, his mood was "fine," and affect was reactive "with no irritability." *Id.* at 44 (citing *id*. at 680). And ultimately, the ALJ concluded that Montez is limited to occasional interaction with the public and coworkers. Consequently, Montez's argument invites the Court to reweigh evidence, which it may not do. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) ("The ALJ as factfinder has the sole responsibility for weighing the evidence.").

Moreover, Montez does not direct the Court to any evidence that he has difficulty with authority figures such as supervisors. The record shows that on a functional report questionnaire, Montez stated that he does not get along with authority figures such as police, bosses, landlords, or teachers. Tr. at 296 (i.e., Ex. 11E at 6.). But he also stated that he was never fired or laid off from a job because of any problems in getting along with other people. *Id*. It is also worth noting that the state agency psychological consultant who reviewed the claim file at the reconsideration stage found that although Montez's ability to interact appropriately with the general public was moderately limited, his ability to accept instructions and respond appropriately to criticism from supervisors was not significantly limited. *Id*. at 118. So, the ALJ could have reasonably concluded that he has the ability to interact with supervisors without limitations.

The Court therefore finds no error on the part of the ALJ for not including any specific limitation on interaction with supervisors.  *Cf. Bros. v. Comm'r of Soc. Sec.*, 648 F. App'x 938, 939 (11th Cir. 2016) (holding ALJ "was not required to refer to supervisors when the residual functional capacity assessment . . . included a restriction on [plaintiff's] social interaction in the workplace," in that the plaintiff "can work where only occasional interaction with the public and co-workers is required" (brackets omitted)).  The Court overrules Montez's assignment of error on this ground.

## F.  Suitable Work in the Economy

Montez argues that the ALJ erred by failing to establish that there exists suitable work in the national or "local" economy that he can perform.  Pl.'s Br. at 22.  At step five, relying on the vocational expert's (VE) testimony at the hearing, the ALJ determined that, considering Montez's age, education, work experience, and RFC, jobs exist in significant numbers in the national economy that Montez could perform.  Tr. at 50.  Specifically, the VE identified three jobs: furniture rental clerk (DOT No. 295.357-018) (25,000 positions in the national economy); usher (DOT No. 344.677-014) (18,000 positions in the national economy); and shipping and receiving weigher (DOT No. 222.387-074) (20,000 positions in the national economy).  *Id.* at 99–100.  Montez advances two arguments: (1) the VE did not testify about the number of shipping and receiving weigher jobs available in the "local" economy; and (2) given the RFC limitation of occasional contact with co-workers and the public, the jobs of furniture rental clerk and usher should not have been offered by the VE.  Pl.'s Br. at 22–23.

Turning to the first argument, the VE testified that there are approximately 20,000 shipping and receiving weigher positions in the national economy.  Tr. at 100.  That means, according to Montez, that job represents ".01% of available work in the nation" (he arrives at this

number by reasoning that "there are approximately 340 million people in the nation and

approximately 60% (200 million) of those people are of working age").  Pl.'s Br. at 23.  He avers

that El Paso, Texas, where Montez lives, has a population of 690,000, and therefore, it has

414,000 working age people (i.e., 20% of El Paso's total population).  *Id.*  As a result, he

calculates, only 41 (i.e., 0.01% of 414,000) shipping and receiving weigher positions are

available in the "local" economy.  *Id.*  That number of positions, he argues, does not represent

enough jobs in the economy.  *Id.*  Montez does not cite any authority in support of his math,

method, or argument.

The Commissioner correctly points out that under a regulation, it does matter whether

work exists in the immediate area in which a claimant lives, and therefore, she adds, the ALJ was

not tasked with identifying the number of jobs that exist in El Paso.  Def.'s Br. at 16.  That

regulation provides: "We consider that work exists in the national economy when it exists in

significant numbers either in the region where you live or in several other regions of the country.

It does not matter whether[] [w]ork exists in the immediate area in which you live."  20 C.F.R. §

404.1566(a)(1); *see also Boucher v. Astrue*, 371 F. App'x 917, 924 (10th Cir. 2010) ("But Ms.

Boucher focuses her argument on the jobs that are available in her local region when the proper

inquiry is whether a significant number of jobs exist in the national economy." (citing §

404.1566(a)); *Nation v. Apfel*, 194 F.3d 1313, 1999 WL 970302, at *7 (6th Cir. Oct. 15, 1999)

(unpublished table decision) ("[T]he relevant inquiry in determining job availability is the

national economy and not the plaintiff's neighborhood." (addressing 20 C.F.R. § 416.966(a)(1))).

Moreover, Montez, who was represented by counsel at the hearing before the ALJ, did

not cross-examine the VE on his views on the availability of shipping and receiving weigher

jobs.  Tr. at 101.  The Court therefore finds that Montez has not demonstrated that the ALJ erred

in determining that shipping and receiving weigher jobs exist in significant numbers in the

national economy.  *See Garcia v. Comm'r, SSA*, 817 F. App'x 640, 649 (10th Cir. 2020)

(rejecting plaintiff's argument that the ALJ erred in finding there was a significant number of

jobs in the national economy that he was capable of performing in part because "his counsel

could have asked," but did not ask, "additional questions at the hearing to clarify such issues");

*see also Perez v. Barnhart*, 415 F.3d 457, 464 (5th Cir. 2005) (holding substantial evidence

supported the ALJ's determination that plaintiff was capable of sedentary work because "[t]he

VE testified that there were numerous jobs in the national economy that [the plaintiff] could

perform, but [the plaintiff]'s attorney neither cross-examined the VE nor provided any contrary

evidence").[29]

It is unnecessary to address the merits of Montez's other argument about the remaining

two jobs that the VE identified.  *See DeLeon v. Barnhart*, 174 F. App'x 201, 203 (5th Cir. 2006)

("[T]here was substantial evidence to support the Commissioner's finding that [the plaintiff] had

the RFC to perform, at least, two jobs identified by the VE, and [the plaintiff] was not prejudiced

by any purported error related to other jobs identified by the VE."); *see also Thomas v. Astrue*,

277 F. App'x 350, 353 (5th Cir. 2008) ("It is well-settled . . . that an ALJ may rely on the

---

[29] As one appellate court recently stated in rejecting a similar argument as the one Montez
advances here:

> [E]ven if we were to accept [the plaintiff]'s invitation to take a closer look at the number
> of available jobs in his region, we lack any factual support to find that the ALJ erred.  [The
> plaintiff] (who was represented by counsel below) did not ask for the vocational expert's
> views on the availability of such jobs in his region and failed to argue anything relating to
> step five to the ALJ.  With no relevant factual development in the record, we can only
> speculate.  [The plaintiff] thinks we can get around that problem by adopting his back-of-
> the-envelope calculations: Wisconsin's population makes up only 1.8% of the nation's total
> population, so he thinks only 1.8% of the 31,000 jobs (558) are available in his state.  We
> decline to address such factual matters on appeal without record support.

*DuCharme v. Kijakazi*, No. 21-2204, 2022 WL 3287974, at *4 (7th Cir. Aug. 11, 2022) (unpublished).

testimony of a vocational expert in determining a claimant can perform other work." (citing *Boyd v. Apfel*, 239 F.3d 698, 706–07 (5th Cir. 2001))).  The Court overrules Montez's assignment of error to the ALJ's step five determination.

## V.   CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that the Commissioner's decision is **AFFIRMED**.

A separate judgment will be issued.

**So ORDERED and SIGNED this  22nd  day of December 2023.**

**ANNE T. BERTON**
**UNITED STATES MAGISTRATE JUDGE**